ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 24 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA ex rel.,
EMILIYA GAYEVSKAYA and YURI
GAYEVSKAYA
    Plaintiffs

v.

ATLANTA INSTITUTE OF MEDICINE AND
REHABILITATION, INC, LAWRENCE E.
EPPLEBAUM, M.D., individually and d/b/a
"BJCC OF ATLANTA" and "Back Pain Fund",
LIUDMILA TAVROVSKY, M.D. and PAIN
CLINIC OF AIMR, P.C.

    Defendants.

CIVIL ACTION FILE
NO. **1 : 0 6 - C V - 0 4 2 4**

**FILED UNDER SEAL**

## COMPLAINT

**COMES NOW, EMILIYA GAYEVSKAYA,** and **YURI GAYEVSKAYA,** Plaintiffs

in the above-styled action, by and through their counsel of record, Harmon, Smith, Bridges &

Wilbanks, and states that this is an action brought on behalf of the United States of America by

EMILIYA GAYEVSKAYA and YURI GAYEVSHAYA (collectively referred to as "Relators")

against **ATLANTA INSTITUTE OF MEDICINE AND REHABILITATION, INC,**

**LAWRENCE E. EPPLEBAUM, M.D., individually and d/b/a "BJCC OF ATLANTA" and**

**"BACK PAIN FUND", PAIN CLINIC OF AMIR, INC., LIUDMILA TAVROVSKY M.D.,**

**PAIN CLINIC OF AIMR, P.C.** and affiliated entities, (hereinafter sometimes collectively

referred to as "Defendants") pursuant to the Qui Tam provisions of the Civil False Claims Act,

31 U.S.C. §§ 3729-33.

1

## THE PARTIES

**1.**

Plaintiff EMILIYA GAYEVSKAYA and YURI GAYEVSKAYA are citizens of the United States of America. Each resides in the State of Maryland residing at Apartment IC, 6980 Marsue Drive, Baltimore, Maryland 21215. Relators bring this *qui tam* action based upon direct and unique information obtained arising out of their medical treatment by Defendants. As characterized by the False Claims Act, Plaintiffs will be referred to collectively as "Relators" hereafter.

**2.**

Defendant, ATLANTA INSTITUTE OF MEDICINE AND REHABILITATION, INC. (hereinafter "Defendant Atlanta Institute") is a Georgia for profit medical corporation operating with other affiliated entities (to include other defendants), whose principal place of operations is at Suite E, 2911 Piedmont Road NE, Fulton County, City of Atlanta, State of Georgia 30305. Relators received medical treatment from Defendant Atlanta Institute commencing August 31, 2004 through September 7, 2004. Defendant Atlanta Institute transacts business in the State of Georgia and within the Northern District of Georgia. The registered agent for said defendant is LAWRENCE E. EPPELBAUM, who may be served at Suite E, 2911 Piedmont Road NE, Fulton County, City of Atlanta, State of Georgia 30305.

**3.**

Defendant LAWRENCE E. EPPELBAUM (hereinafter "Defendant Eppelbaum") individually and d/b/a "BBCC of Atlanta" and "Back Pain Fund" is a Georgia licensed medical physician employed by Defendant Atlanta Institute and residing at 4060 Indian Town Road, Cobb County, Marietta, GA 30305. Defendant Eppelbaum has formed and operates an entity

2

named "BBCC of Atlanta" and a purported charitable "fund" under the name "Back Pain Fund".
This "fund" is used as a part of conspiracy to carry out and aid and abet the fraudulent conduct
and false claims submitted to the Government, as hereafter described. (Exhibit 1). Relators
received medical treatment from Defendant Eppelbaum, commencing August 31, 2004 through
September 7, 2004. Defendant Eppelbaum transacts business in the State of Georgia and within
the Northern District of Georgia. Defendant Eppelbaum may be served at his residence at 4060
Indian Town Road, Cobb County, Marietta, GA 30305. There is no corporation or Georgia
registered charity under the names BBCC of Atlanta or Back Pain Fund. This "charity" is not
listed with the IRS as a charity. (Exhibit 2).

**4.**

Defendant PAIN CLINIC OF AIMR, P.C., (hereafter "Defendant Pain Clinic") is a for
profit corporation operating as a Georgia licensed ambulatory surgery center at 2911 Piedmont
Road, Suite F, Atlanta, GA. Said defendant is a medical provider who submitted ASC facility
bills to the Government for medical treatment provided to Relators. Defendant Eppelbaum is the
Chief Executive Officer of said defendant, who whom service may be obtained at the address set
forth above in this paragraph. Defendant Pain Clinic transacts business in the State of Georgia
and within the Northern District of Georgia

**5.**

Defendant LIUDMILA TAVROVSKY, M.D., (hereafter "Defendant Tavrovsky') is an
individual who provided certain medical treatments to Relators as a medical provider and did bill
and receive reimbursement from Medicare for such treatment of Relators. Said defendant resides
at 1714 Ashebark Lane, Marietta, GA 30068, upon whom service may be obtained. Upon

3

information and belief, said defendant is employed as a medical provider by Defendant Atlanta Institute and Defendant Pain Clinic.

## JURISDICTION AND VENUE

**6.**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b). This Court has jurisdiction to entertain a qui tam action. Relators are an "original source" and can institute this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. Sections 3729-33 (hereinafter "FCA").

**7.**

Venue is appropriate as to each Defendant, in that one or more of Defendants can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

**8.**

Relators have presented the Government with disclosures regarding the FCA violations described herein as required by 31 U.S.C. Sec. 3730(b)(2).

## STATUTORY BACKGROUND

**9.**

The Medicare Program (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. It is overseen by the United States Health and Human Services Department. Medicare was designed to assist participating

4

states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify for Medicare.

**10.**

The Medicaid Program (hereafter "Medicaid") is a Health Insurance Program administered by the Government of the United States that is funded by State and Federal taxpayer revenue. It is overseen by the United States Health and Human Services Department. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially-needy individuals that qualify for Medicaid.

**11.**

The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) makes knowingly presenting, causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment a violation of Federal Law punishable by three times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim made.

**12.**

The FCA, 31 U.S.C. § 3729(a)(2) makes knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law punishable by three times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim made.

**13.**

The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the

5

United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

**14.**

For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

**15.**

The Health Insurance Portability and Accountability Act of 1996 (HIPPA) amended the Social Security At to prohibit providers from offering patients any inducement to order or receive Medicare or Medicaid reimbursable items or services from a particular provider, practitioner, or supplier. Specifically, section 231 (h) of HIPAA established a new provision 1128(a)(5) of the Social Security Act, to provide for the imposition of a CMP against any person who:

> "*Offers or transfers remuneration to any individual eligible for benefits under [Medicare or Medicaid] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or suppler any item* or service for which payment may be made, in whole or in part under [Medicare or Medicaid]*"*

**16.**

"Remuneration" is defined as transfers of items or services for free or for other than fair market value. Section 1128A(i)(6) of the Social Security Act.

6

**17.**

The latter restriction of beneficiary remuneration is commonly referred to as the "Anti-Beneficiary Inducement Provision". There are no applicable "safe harbors" to any of the Defendants under the facts of this qui tam action.

**18.**

Defendants have repeatedly violated the Anti-Kickback Act. The Anti-Kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce referrals of items or services reimbursable by any Federal health care program. See section 1128B(b) of the Act.

**19.**

Specifically, the statute provides that:

*Whoever knowingly and willfully offers or pays [or solicits or receives] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -- to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony.*

**20.**

Thus, where remuneration is paid purposefully to induce referrals of items or services for which payment may be made by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration"

7

includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly.

**21.**

The Anti-Kickback statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Greber, 760 F.2d 68 (3d Cir.), cert. denied, 474 U.S. 988 (1985). Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. The OIG may also initiate administrative proceedings to exclude persons from Federal and State health care programs or to impose civil monetary penalties for fraud, kickbacks, and other prohibited activities under sections 1128(b)(7) and 1128A(a)(7) of the Act. Subsequent rulings and advisories have not changed the essence of this prohibition, especially where the remuneration is not nominal or of small value.

**22.**

Numerous OIG Advisory Opinions have made it clear that there is no "safe harbor" (see OIG Advisory Opinion 00-7 regarding factors applicable to "free transportation" and there is a violation where the intent was or is to influence the selection of defendants by the patient. Each factor referenced therein has been violated by Defendants. Advisory Opinion 97-4 (ASC) and where remuneration is not nominal is also applicable to these factors. See also, OIG Advisory Opinion 02-14 and OIG August 2002 Special Advisory Bulletin (violation of Anti-Kickback Act} which also provides guidance as to the gravity of Defendants FCA offenses.

8

**23.**

OIG Advisory Opinion 00-7 specifically stated that providing out-of-state patients free round trip airline tickets to the state where provider is located in order for patient to receive services at their facilities is an example of an abusive arrangement.

**24.**

Remuneration from a medical provider to a patient that is intended to induce the patient to obtain services implicates the anti-kickback statute. For example, the routine waiver of Medicare Part B coinsurance -- a payment obligation required by Federal law -- implicates the anti-kickback statute, as would offers of cash or other valuable gifts that are intended to induce patients to order or receive services paid for in whole or in part by a Federal health care program. Free transportation services and lodging offered by a provider to Federal health care program beneficiaries may have monetary value and implicate the anti-kickback statute, if the requisite intent to induce self-referrals is present.

**25.**

The Defendants have violated the Anti-Beneficiary Inducement law, the Anti-Kickback Act, the Stark Act, and the FCA by providing inducements to Medicare/Medicaid patients. Also, the separate fraudulent billing practices and actions of the Defendants described hereafter expose the unlawful acts of Defendants in obtaining intentional and unlawful payments from the Government. Defendants "free airline transportation, hotel accommodations and meals, and the providing of no-expense vacations" to induce the patients to select Defendants medical services and the separate fraudulent submissions of reimbursement claims by their physicians, medical providers and medical facility for otherwise medically unnecessary and other non-reimbursable medical procedures and services constitute violations of Federal law.

**26.**

The purpose of the fraudulent schemes described in the following paragraphs hereafter was to induce Medicare/Medicaid patients to select the medical services of Defendants and to thereafter submit and obtain reimbursement via fraudulent and false claims from Medicare, Medicaid and other private insurers.

**27.**

As to additional violations of the FCA, the Defendants have unlawfully obtained reimbursements through false claims and false documents and the misuse of Medicare coding. These additional FCA violations include (1) providing of medically unnecessary services; (2) billing for services not provided; (3) misuse of CPT coding and modifiers (e.g. Modifier -59) causing unlawful reimbursements; (4) the making of unlawful referrals and (5) the deceptive ownership of certain prohibited financial interests in violation of federal law (Stark violation).

**28.**

In billing the Government (Medicare/Medicaid) and private payors, medical providers in making claims for payment and seeking reimbursement are required to use certain defined medical procedure and service codes commonly referred to as "CPT" codes. CPT coding is a systematic listing and coding of procedures and services performed by physicians. Each procedure or service is identified with a five-digit code. The use of CPT codes simplifies the reporting of medical procedures and services. With this coding and recording system, the procedure or service rendered by the physician is accurately identified.

**29.**

Defendants submitted claims for numerous examinations, tests and treatments using CPT codes. Defendants submitted CPT codes with modifiers. See Exhibit 3. These CPT 5-digit codes

10

are sometimes modified by the use of an additional two-digit code attached to the five-digit code.

**30.**

The use of a modifier is authorized only under specific circumstances by Medicare.

Modifiers may be used to indicate the following: (1) a service or procedure has both a

professional and technical component (2) a service or procedure was performed by more than one

physician; (3) a service or procedure has been increased or reduced; (4) only part of a service was

performed; (5) an adjunctive service was performed; (6) a bilateral procedure was performed; (7)

a service or procedure was provided more than once; (8) unusual events occurred.

**31.**

When attached to a service or procedure code, it indicates that a service or procedure has

been altered by some specific circumstance, but not changed in its definition or code. Modifer -

59 is not appropriate when attached to a procedure that is part of a more comprehensive

procedure. Only codes that would normally be denied, but in a particular situation would be

eligible, should have a modifier -59 attached. Defendants repeatedly used Code modifier "-59"

to bypass edits in order to get additional reimbursement. As stated, this modifier's use is

authorized only where the service is a "distinct procedural service". The use of this modifier was

for purposes of submitting a false claim and to avoid detection.

**32.**

Defendant Pain Clinic submitted billing for facility fee reimbursement for certain

procedures (CPT 64475, 64476) performed by Defendant Eppelbaum. Such referrals without

disclosure to patients of ownership interests of physician are a violation of the Stark Act of FCA.

(Exhibit 3).

11

**33.**

Defendants' medical providers have submitted fraudulent claims for reimbursement by the described unlawful and fraudulent misconduct of defendants in express violation of federal statutes, rules and regulations as described hereafter.

## SUMMARY OF FACTUAL BACKGROUND

**34.**

Relators, Emiliya Gayevskaya and her husband, Yuri Gayevskaya, are elderly Medicaid/Medicare beneficiaries. Both are Russian emegres. They reside in Baltimore, Maryland. Relators do not speak any English and relied on the representations made in TV Guide advertisements and promotional materials of Defendants in the Spring of 2004 and the verbal representations made to them subsequently by Defendants. (Exhibits 4-8, with Translation)

**35.**

The TV Guide advertisements were distributed in Baltimore, Maryland. The advertisement was in the Russian language. The advertisement represented that Defendant Atlanta Institute could successfully treat back pain conditions at "no costs" to the patient. This advertisement represented that the non-medical costs would be paid by a "charity" with the medical costs paid by Medicare/Medicaid. Even though the "charity" was never specifically identified to Relators, the costs of transportation, meals, hotel and a free vacation were purportedly provided by "BBCC of Atlanta/Back Pain Fund" (which now appears to be a "sham" charitable entity created and operated by Defendants to further the fraudulent scheme described herein). Because of such financial promises and assurances "of no costs," "free round trip airfare,

12

hotels and meals to an from Atlanta" and a "free vacation to Daytona Beach, Florida", Relators

selected Defendants to provide the promised medical treatment. Without such financial promises

and assurances of free medical care and fringe benefits, Relators could not have afforded to

obtain this treatment and would not have selected Defendants for such treatments.

**36.**

Relator Emiliya Gayesvskaya has suffered from chronic mid and lower back pain for

several years. Prior to being seen by Defendants, Relator Emiliya Gayesvskaya had been treated

by several physicians for her medical condition with only limited results. Defendants did not

review, or even request, prior medical records of either Relator.

**37.**

Relator Yuri Gayesvskaya had no previously diagnosed back problems. He had no

medical history of allergies or vascular problems. However, the Defendants' billed for allergy

tests and vascular tests for these conditions. Incredibly, several of these alleged tests for these

conditions were conducted after the time that Relator Yuri Gayesvskaya had left Atlanta to return

home. As was the case with his wife, the Defendants did not review, or even request, any prior

medical records of Mr. Gayesvskaya.

**38.**

Relators contacted Defendants through the telephone number listed in the advertisement

(i.e., 770-447-0360), to see if Relators could obtain the promised treatment at no costs to them

appearing in the advertisement. The latter number is listed to an entity called "Russiantown, Inc."

Relators provided information on the telephone, including their Medicare and Medicaid numbers.

They were promised a videotape and a letter explaining the program. Defendants did not identify

which doctors would be providing the medical treatment. Relators thereafter received the

13

videotape and letter (see Exhibit 5). Several weeks after receiving the videotape, Relators received a telephone call from Atlanta, GA. During this telephone call, Relators agreed to participate in the program and were given approximate dates for their travel. Several days later, Relators received a telephone call telling them of the dates of travel to Atlanta, GA. They were told to pick up the tickets at the Atlanta Airport.

**39.**

On or about August 30, 2004, Relators went to the airport and received free "e-tickets" and flew to Atlanta, GA. They were placed in an Atlanta hotel and provided local transportation and meals without charge. After the first round of treatments, they were taken to Daytona Beach, FL and again were placed in a hotel and provided meals at no charge. On their return to Atlanta, GA Relator Emiliya Gayevskaya received a second round of injections. Thereafter, they were provided free transportation to the Atlanta Airport and provided free airline transportation back to Baltimore, Maryland.

**40.**

Relator Emiliya Gayevskaya was never informed by Defendants that she was receiving injections which would "kill" the nerves causing the back pain. Relator Yuri Gayevskaya never received any tests for allergies even though Medicare was billed for them. No information was provided to Relators as to any investment or ownership interests of Defendants in the ASC referenced by Defendants.

**41.**

Defendants provided Relators free, round trip airline transportation, local transportation, hotel accommodations, their meals during treatment, and a "free vacation" in Daytona Beach, Florida. Relators were not advised or given the option to select any other physician in Atlanta,

14

GA or elsewhere except for the Defendant physicians associated with Defendant Atlanta Institute. Relators were not aware that such remunerations were illegal.

**42.**

As stated, Relators provided Defendants with their Medicaid beneficiary numbers as requested by Defendants.

**43.**

As stated, on August 31, 2004, Relators went to the offices of Defendants and were examined and treated by Drs. Eppelbaum and Tavrovsky. (Exhibits 9, 10). No prior medical records of either Relator was requested by or provided to Defendants prior to or during treatment. Numerous tests as described in the Medicare billing attached as Exhibit 3 were provided by Defendants to Relator Emiliya Gayevskaya. The purported allergy tests for Relator Yuri Gayevshaya were not provided. No explanations were given to Relators by Defendants as to what tests were being given or why.

**44.**

The examinations, tests and treatment occurred from August 31, 2004 through September 7, 2004. Relators were never advised that Defendant Eppelbaum had financial interests in Defendant Pain Clinic of AIMR, P.C. Defendants Eppelbaum and Tavrovsky did not recommend any other alternative medical treatment for their respective back pain condition other than the nerve destruction injections which were subsequently performed by Defendants. Also, Relator Emiliya Gayevskaya was not advised by Defendants of the potential serious complications which can arise out of the nerve destruction treatment that was performed on her body.

**45.**

As stated, from September 3, 2004 through September 6, 2004 Defendants provided Relators a vacation-break in Daytona Beach, Florida. They were provided free transportation by van, hotel accommodations and meals by Defendants during this vacation.

**46.**

During Relators' return from Daytona Beach to Atlanta, Relator Emiliya Gayevskaya fell getting out of the Defendants' van and was injured. As a result of such injury, said Relator consulted and engaged a Maryland attorney to seek compensation for her injuries from Defendant Atlanta Institute. A civil action has been filed, styled *Gayesvshaya v. Atlanta Institute of Medicine and Rehabilitation, Inc.,* Circuit Court of Baltimore County, Maryland to recover for personal injuries.

**47.**

In her consultations with her personal injury attorney she was made aware that the actions of Defendants in providing free airline transportation, free hotel and meals and the providing of a "cost-free" vacation to Daytona Beach, Florida as an inducement to choose said Defendants as medical providers was illegal. Prior to that time, Relators did not know that the providing of such "free" services and accommodations was illegal.

**48.**

Within several months, the back pain returned. The treatments by Defendants were ineffective and provided only minimal and temporary relief.

**49.**

Attached are similar representative TV Guide advertisements, which set out similar representations. Rough translations are attached as to each advertisement. (Exhibits 4-7). The ads specifically state the free transportation, hotel, meals and vacation are paid by a "charitable fund".

**50.**

Defendants have formed a purported charitable "Fund" through Defendant Eppelbaum under the name of "BJCC" of Atlanta or "Back Pain Fund" which on information and belief is a "dummy" operation of Defendants which is used to unlawfully and fraudulently shield the true source of funds paying for the free transportation, meals and hotel accommodations. The true source of the funding is Defendants who use Medicare/Medicaid funds to subsidize these expenses. The Defendants through this "dummy" fund have attempted to disguise their fraud. This fund is purportedly administered by Defendant Eppelbaum. The purported "charity's" web site implies that it is charitable. It is declared to be "charitable" in the ads. However, it is not listed as an IRS approved charity and it is not listed with the Georgia Secretary of State as required by law for any charitable organization making solicitations for contributions. Its address is an adult day care business. It only pays for Medicaid-qualified patients of Defendants and not other medical providers in Atlanta, GA. This "fund" is a sham which was set up to further the Defendants' fraudulent conspiracy. The "charity" pays only for patients who are receiving treatment from Defendant Atlanta Institute and the other physician defendants.

**51.**

The attached ads contain former patient recommendations which confirm and corroborate the above described solicitations and unlawful conduct of Defendants.

## SUMMARY OF FALSE CLAIM, AKA AND STARK VIOLATIONS

### 52.

(A) Violation of the "Anti-Inducement Beneficiary Provision" of OPPA by the offering of free transportation, hotel and meals and a vacation as inducement to Medicare/Medicaid beneficiaries to select Defendants to provide medical services;

(B) Violation of the Anti-Kickback Act;

(C) Violation of FCA by submitting false claims for medically-unnecessary services and tests and the unlawful use of CPT codes and modifiers and the billing for services not provided;

(D) Violation of FCA by falsifying records and claims in order to obtain unlawful reimbursements from the Government;

(E) Conspiracy by Defendants to fraudulently obtain unlawful reimbursements from Medicare/Medicaid.

(F) Unlawful self-referral under Stark Act by physician or physician group to owned ASC without giving prior notice to patient of such financial interests. 64 Fed. Reg. 63518 (1999) (codified at 42 C.F.R. pt. 1001).

(G)    Unlawful use of Modifier -59 to avoid detection by Medicare/Medicaid of the illegal testing and services billed by Defendants for services allegedly rendered to Relators. See, "Use of Modifier -59 to Bypass Medicare's National Correct Coding Initiative Edits", dated November 2005, OEI-03-02-00771.

## COUNT I

## DEFENDANTS HAVE AND ARE VIOLATING THE 'ANTI-INDUCEMENT BENEFICIARY PROVISION' OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT, 42 USC SEC. 1320a-7a(a)(5) (OPPA)

18

**53.**

Relators incorporates paragraphs 1 through 52 as if fully set out under this Count I.

**54.**

Defendants have individually and in conspiracy with each other violated the Anti-Inducement Beneficiary Provision of OPPA.

**55.**

Defendants have solicited by interstate and intrastate advertisements and the US mail service and telephonic communications Medicare and Medicaid beneficiaries across the United States, to include Relators, for the specific purpose and intent to have the beneficiary patient to select Defendants for medical services over other medical providers.

**56.**

Defendants have offered and have paid financial remuneration to Medicare and Medicaid beneficiaries through the use of a "sham" Fund, i.e., the "Back Pain Fund" of free interstate transportation to Atlanta, GA, hotel and meals and a free vacation for selecting Defendants as a medical provider. Defendants have fraudulent failed to disclose such inducements to the Government or the Relators/patients.

**57.**

As a result of violating said law, Defendants are liable to the Government for the full-amount of all reimbursements received by Defendants for those Medicare/Medicaid beneficiaries unlawfully induced to select Defendants' medical services. Said violations constitute a violation of the FCA.

## COUNT II

## DEFENDANTS HAVE AND ARE VIOLATING THE 'ANTI-KICKBACK ACT' BY OFFERRING ILLEGAL REMUNERATION FOR SELF-REFERRALS AND BY SUCH CONDUCT, HAVE VIOLATED THE FCA AS WELL

**58.**

Relators incorporates paragraphs 1 through 57 as if fully set out under this Count II.

**59.**

Defendants have and continue to violate the Anti-Kickback Act by their illegal

inducements in influencing Medicare and Medicaid beneficiaries to select Defendants to provide

medical services funded by Government programs and private payors.

**60.**

That said misconduct is knowingly and intentionally done by Defendants as evidenced in

part by the creation of a 'sham' charitable fund to hide the source of such remunerations.

**61.**

That said conduct is criminal and a violation of both the Anti-Kickback Act and the FCA.

## COUNT III

## DEFENDANTS' HAVE AND ARE VIOLATING THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729-33

**62.**

Paragraphs 1 through 61 are incorporated into Count III as if fully set forth herein.

**63.**

This is a civil action brought by Relators on behalf of the United States against the

Defendants under the Federal False Claims Act, 31 U.S.C. § 3729-33.

**64.**

The Defendants knowingly or reckless disregarded or in deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, inter alia 31 U.S.C. § 3729(a)(1).

**65.**

Further, the Defendants in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia 31 U.S.C. § 3729(a)(2).

**66.**

The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare. Had the United States known that the bills presented by Defendants for payment were false and misleading, payment would have not have been made for such claims.

**67.**

As a result of Defendants' actions, the United States has been severely damaged.

## COUNT IV
## DEFENDANTS' HAVE CONSPIRED TO VIOLATE THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(3)

**68.**

Paragraphs 1 through 67 are incorporated into Count IV as if fully set forth herein.

**69.**

The Defendants conspired with one another to induce selection of Defendants as a medical provider through the use of unlawful remuneration and to thereby get false and fraudulent claims allowed and paid by the United States.

**70.**

The Defendants conspired together and intentionally withheld information specifically known to Defendants regarding this systemic fraudulent billings to the United States.

**71.**

Accordingly, the Defendants acted in a concerted fashion to defraud the United States, and the Defendants acted together in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States. Accordingly, the Defendants violated 31 U.S.C. § 3729(a)(3).75. As a result of the Defendants' actions, the United States has been severely damaged.

## COUNT V.

## DEFENDANTS HAVE VIOLATED THE STARK ACT ("STARK") 42 U.S.C. Section 1395(n) et. BY FAILING TO EXPRESSLY DISCLOSE THE FINANCIAL OWNERSHIP INTERESTS OF THE REFERRING PHYSICIANS IN THE ASC

**72.**

Relators incorporates and sets out paragraphs 1 through 71 under this Count V.

**73.**

Defendants have violated the Stark Act by failing to disclose to Relators and others of the financial investment and ownership interests of Defendant Eppelbaum in his ASC, Defendant PAIN CLINIC OF AIMR, P.C.

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

(a)     That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729-33 and the Anti-Inducement Beneficiary Provision of OPPA and the Anti-Kickback and Stark Act;

(b)     That judgment be entered in favor of the United States and Relator and against the Defendants in the amount of each and every reimbursement for medical services by Defendants of Medicare/Medicaid beneficiaries who were induced to select Defendants by "free services and remunerations" in violation of the Anti-Inducement Beneficiary Provision of OPPA and that further judgment be obtained against Defendants in the additional amount for all false or fraudulent claims and multiplied as provided by 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per claim, as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)     That Relator be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(d)     That judgment be granted for the United States of America and Relator and against Defendants for any and all costs including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

(e)     That the United States and Relator be granted such other and further relief as the Court deems just and proper.

23

This 24 day of _____ File _____, 2006

Respectfully Submitted,

_Marlan B. Wilbanks_
Marlan B. Wilbanks
State Bar No. 758223

_Ty M. Bridges_
Ty M. Bridges
State Bar No. 081500

1795 Peachtree Road, NE
Suite 350
Atlanta, Georgia  30309-2339
Phone:  404-881-1200
Fax:     404-881-8523


Attorneys for Relators Emiliya Gayevskaya and
Yuri Gayevskaya

24